UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HENRY E. HILDEBRAND, III, Trustee and Real Party in Interest on Behalf of Bankruptcy Estate of Karen Piper, ) ) ) ) Plaintiff, ) ) v. ) ) DOLLAR GENERAL CORPORATION, ) ) Defendant. ) | Case No. 3:11-cv-00554 Judge Aleta A. Trauger |

## MEMORANDUM

Defendant Dollar General Corporation ("Dollar General") has filed a Motion for Summary Judgment (Docket No. 47), to which the plaintiff, Henry Hildebrand, III, Trustee and Real Party in Interest on Behalf of Bankruptcy Estate of Karen Piper ("Trustee"), filed a Response in partial opposition (Docket No. 57), and Dollar General filed a Reply (Docket No. 61). For the reasons stated herein, Dollar General's Motion for Summary Judgment will be granted in part and denied in part.

## BACKGROUND

**I.** **Overview**

Karen Piper worked in Dollar General's Payroll Department from September 2007 through February 2010, when Dollar General terminated her for performance deficiencies. The Trustee alleges that Piper's performance deficiencies stemmed from Dollar General's refusal to accommodate Piper's loss of vision in one eye. The Trustee claims that, as a consequence of the manner in which Dollar General handled Piper's disability, Dollar General is liable under the

1

American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, for (1) discriminatory discharge, (2) failure to accommodate Piper's disability, and (3) fostering a hostile work environment.[1]  Dollar General has moved for summary judgment on all claims.[2]  The Trustee has abandoned his hostile work environment claim (*see* Docket No. 57, Trustee Resp., at p. 4 n.2), which the court will dismiss without further analysis.  This Memorandum will address the remaining discriminatory discharge and failure to accommodate claims.

## II.     Piper Declaration

As an initial matter, Dollar General argues that the court should ignore the Piper Declaration on the grounds that it contradicts Piper's deposition testimony, is self-serving, and/or is otherwise speculative.

On the whole, Dollar General's argument is not well-taken.  The Piper Declaration

---

[1]Piper originally filed this lawsuit on her own behalf.  After the court ruled that Piper was judicially estopped from asserting her claims because she failed to disclose them in her concurrent personal bankruptcy case, *see Piper v. Dollar Gen. Corp.*, No. 3:11-554, 2011 WL 4565432 (M.D. Tenn. Sept. 29, 2011) [Docket No. 24 in this case], the Trustee substituted himself as the real party in interest in this case.  (Docket No. 26.)

[2]In support of its Motion for Summary Judgment, Dollar General has filed certain discovery materials (*see* Exhibits to Docket No. 47 (including, *inter alia*, deposition excerpts)), a Memorandum of Law (Docket No. 48), a Supplemental Memorandum of Law (Docket No. 52) (leave to file granted at Docket No. 53)), a Statement of Undisputed Material Facts (Docket No. 49), the Declaration of Margarita Burns (Docket No. 50) (Dollar General Garnishment Supervisor), the Declaration of Lisa Wachter (Docket No. 51) (Dollar General Senior Payroll Manager), and a Reply brief supported by the Declaration of Shandra Reece (Docket No. 61, Ex, (attaching screenshots)) and a deposition exhibit (*id.*).  In support of his opposition to Dollar General's motion, the Trustee has filed a brief in opposition (Docket No. 57), supported by the Declaration of Karen Piper (*id.*, Ex. 1) and deposition excerpts with selected exhibits thereto (*id.*, Exs. 2-6), and a Response to Dollar General's Statement of Undisputed Material Facts (Docket No. 58).  The Trustee has not filed a separate statement of additional facts.  Therefore, in identifying the relevant facts, the court has considered the Trustee's responses to Dollar General's statement of facts and has reviewed the underlying documents referenced by the parties.  Unless otherwise noted, the facts are drawn from those materials and the court has drawn all reasonable inferences in favor of the Trustee.

contains 28 paragraphs detailing a myriad of potentially relevant facts, only a handful of which Dollar General has directly addressed in its briefing. The court has analyzed Piper's deposition transcript and compared it to the Piper Declaration. The facts recited in the Piper Declaration largely supplement Piper's deposition testimony, rather than contradict it. For example, in several paragraphs of the Piper Declaration, Piper discusses the instances on which she claims to have asked her supervisors for accommodations. (*See, e.g.*, Piper Decl. ¶¶ 10 (discussion with supervisor Charlotte Frakes), 12 (discussions with supervisor Margarita Burns); 18-19 (discussions with supervisors Frakes and Lisa Wachter).) The facts in these paragraphs (among others) are based on Piper's personal knowledge, and Dollar General has not identified any contradictory testimony from Piper herself. Indeed, in some instances, Piper's testimony is consistent with deposition testimony from Dollar General's own witnesses.[3]

However, the court is sensitive to one of Dollar General's fact-specific arguments. In Paragraph 24 of the Piper Declaration, Piper avers that "[a]ll of the reasons given by Dollar General regarding timeliness and accuracy were directly related to my vision." That statement is indeed conclusory and, standing alone, is insufficient to create a genuine dispute of material fact. On the other hand, the remainder of the Piper Declaration, including the remainder of Paragraph

---

[3]*Compare, e.g.*, Piper Decl. ¶ 10 (stating that, in April 2009, she told Frakes about her eyesight and asked about obtaining a larger monitor or some other type of accommodation) *with* Docket No. 57, Ex. 2, Charlotte Frakes Dep. at 11:21-13:6 (testifying that Piper complained to her about her eyesight); 18:1-4 ("Q: [D]id you understand that she had some difficulty or problems with her vision? A: Yes. Q: And did you understand her statement to you about a magnifier or larger computer screen to be connected to her vision? A: Yes.") and 19:15-19 ("Q: [D]o you now understand that when [Piper] spoke to you about a larger computer screen or a magnified computer screen, that she was asking for an accommodation for her eyesight? A: Yes.")); *also compare* Piper Decl. ¶ 6 ("I also have to lean forward at my desk to get closer to the screen and this is very tiring") *with* Frakes Dep. at 34:7-11 (stating that she observed that Piper "sat close to her monitor, as some of them do, depending on their vision").

3

24, contains more specific explanations and rebuttals from Piper relating to her acknowledged performance issues while working as a Garnishment Specialist at Dollar General during the relevant time period. Piper's deposition transcripts and other materials in the record also contain information relating to the potential relationship between Piper's disability and her performance deficiencies. As explained herein, it is material whether all of Piper's performance deficiencies were attributable to her disability. Therefore, the court has not accepted the first sentence of Paragraph 24 of the Piper Declaration at face value. Instead, the court has analyzed the totality of the record with regard to this particular material fact.

### III. Basic Facts[4]

Piper worked for Dollar General as a Payroll Specialist from September 2007 through July 2009, a role in which she processed paychecks, tax statements, and other disbursements. In October 2008, while working as a Payroll Specialist, Piper experienced a sudden loss of vision in her left eye while at work, which essentially left her blind in one eye. While working as a Payroll Specialist, Piper generally used one screen to enter payroll information. Piper's work involved reading and comprehending images and text on that screen.

In April 2009, while working as a payroll specialist, Piper told her supervisor, Payroll Manager Charlotte Frakes, that she was having problems with her vision. Piper asked Frakes about the possibility of using a larger computer monitor or a magnified screen to assist her in seeing what was on the screen. Frakes and Piper recall Frakes response to Piper's request differently. According to Piper, Frakes not only denied Piper's request for an accommodation,

---

[4]This section contains the basic facts of the case. Where appropriate, certain additional relevant facts are summarized in other sections of this opinion.

4

but also stated that Dollar General would not accommodate her as a general matter and that Piper's remaining option was to apply for disability. According to Frakes, she (Frakes) responded by suggesting that providing the accommodation would be contingent on whether there was "money in the budget for the expenditure." (*See* Docket No. 57, Ex. 2, Frakes Dep. Ex. 2 thereto, Feb. 17, 2010 email from Frakes to Dollar General Human Resources Director Shannon Miles) (referencing request for a larger monitor or magnified screen).[5] Regardless of the actual substance of her response, Frakes now realizes that Piper had been asking for a disability accommodation. Indeed, after learning about Frakes' actions, (now former) Human Resources Director Miles told Frakes that, "when someone asks for an accommodation, please let me know immediately. It doesn't matter if the money is in the budget or not. *Under the ADA, we are required to make this accommodation*, even if the cost is several hundreds of [sic] thousands of dollars." (*Id.*) (emphasis added).

At any rate, Piper avers that the Payroll Specialist role was "not stressful," that she could ask for help when she needed it, and that she could "take her time" entering payroll information as required. Thus, notwithstanding her visual impairment and Dollar General's refusal to accommodate her disability, Piper was able to perform a satisfactory job as a Payroll Specialist.

In July 2009, Dollar General created a new group within the Payroll Department to handle wage garnishments, tax levies, and other similar employee wage deductions. Dollar General

---

[5]As described in this section, on February 16, 2010, Miles told Piper she had been terminated for performance deficiencies, at which point Piper complained that her previous requests to Frakes (among others) for accommodations had been denied, thereby causing the performance deficiencies. On February 17, 2010, the day after Piper's termination, Frakes emailed Miles about Piper's representation that she had previously reported her vision problems to Frakes.

5

promoted Margarita Burns, a former Payroll employee, to the role of Garnishment Supervisor in the new group. Burns then hired three existing employees, including Piper, as Garnishment Specialists. Prior to the creation of the new group, Burns had overheard Piper state that she was "legally blind" and/or "blind in one eye" multiple times.

According to Piper, once she began working as a Garnishment Specialist, she determined that her vision substantially impaired her ability to perform the necessary work. As a Garnishment Specialist, Piper was required to use multiple screens to perform her work, screens with which she had no previous familiarity. The role also involved much more work than the Payroll Specialist position, including writing letters to state entities making garnishment and levy requests, answering calls about garnishments with respect to multiple states, and processing between 30-100 garnishments per day. Because of her visual impairment, Piper had difficulty processing information on the screens as efficiently as her colleagues. To do work accurately, she had to read the information and enter it slowly, but that pace was insufficient to process her existing and incoming workflow.[6] On the other hand, when Piper tried to work more quickly, as

---

[6]Piper complained that she had been saddled with more work than her work colleagues, due to (a) a mis-allocation of work by Burns as between Piper and the other two Garnishment Specialists, and (b) a backlog of garnishment demands that Piper inherited from the previous (outsourced) third-party entity when she took the position. Although neither of those specific complaints is itself linked to her eyesight, Piper appears to argue that, even burdened with an allegedly unfair workload, she might have been able to work through that backlog with a sufficient accommodation. If convinced by this argument, a rational trier of fact could find that, if Dollar General had granted her a proper accommodation, Piper would not have fallen behind on her work. However, the court agrees that Dollar General was not required to re-allocate work as a form of "reasonable accommodation" for Piper's disability, which would essentially have amounted to re-allocating the essential functions of her job. *See Steward v. New Chrysler*, 415 F. App'x 632, 642 (6th Cir. 2011) ("["E]mployers are not required to assign existing employees or hire new employees to perform [essential] functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability."); *Bratten v. SSI Servs., Inc.*, 185 F.3d 625 (6th Cir. 1999) (reallocating 20% of essential duties was not a reasonable

6

Burns pressed her to do, Piper committed more errors because she could not see the screen well and had trouble entering information accurately. When Piper sought assistance from her co-workers to keep up, Burns reprimanded her. Piper's stress level increased and she committed more mistakes, including mistakes that led to two garnishment default judgments against Dollar General. Piper argues that she would not have made those mistakes if Dollar General had accommodated her visual impairment, but Dollar General argues that she made those mistakes independent of her visual impairment.

Piper claims that, during the time frame in which she committed these errors, she sought to improve the situation on her own (by using different types of glasses, none of which helped) and by repeatedly requesting accommodations from Burns. With respect to the issue of accommodation requests, Burns and Piper have provided entirely inconsistent accounts of what transpired. Burns claims that, from the time Piper became a Garnishment Specialist until the date of her termination, Piper never complained to Burns about her eyesight and never requested any type of accommodation. By contrast, Piper avers that, on multiple occasions, she complained to Burns that her eyesight was affecting her work and that she needed some type of accommodation, such as a larger monitor. According to Piper, Burns consistently rebuffed these (oral) requests, at one point telling Piper that she "wasn't special," that Burns "wants a big monitor too," and that other employees also "wanted a big monitor."

In November 2009, Burns placed Piper on a Performance Improvement Plan ("PIP"). Piper continued to make serious mistakes, including misclassifying a Kansas tax levy as a

---

accommodation); *Brown*, 14 F. App'x 482 (6th Cir. 2001) ("The ADA does not require an employer to create a new position to accommodate a disabled worker or to reallocate job duties in a manner that changes the essential functions of a job.")

7

garnishment. On December 2, 2009, December 15, 2009, and January 7, 2010, Burns met with Piper to discuss Piper's progress on the PIP. In February 2010, Burns determined that Piper had not demonstrated significant performance improvement during the PIP process and recommended that Piper be terminated for poor job performance. Piper avers that, at each PIP meeting, she complained to Burns that her inability to see the monitor was affecting the efficiency and accuracy of her work, but Burns rejected these requests and repeated that Burns "would like a big monitor also."

On February 16, 2010, Miles (Dollar General's Human Resources Director at the time), Burns, and Senior Payroll Manager Lisa Wachter met with Piper to inform her of her termination. There is conflicting testimony as to the nature and scope of Piper's response. According to Piper, she again complained that the identified problems were attributable to her eyesight and told Miles that she had complained about the issue to her supervisors in the past, including Frakes, Burns, and Wachter. Piper avers that she pleaded for the chance to prove that she could perform her job with a reasonable accommodation for her visual impairment, but Miles said no. Burns, Wachter, and Miles recall the meeting differently. For example, at deposition, Burns acknowledged that Piper claimed to have alerted Frakes about her visual impairment affecting her work, but Burns testified that Piper also blamed factors other than her vision, including blaming her co-workers for skimping on their own responsibilities and for potentially sabotaging Piper's work. Miles testified that, to her recollection, Piper admitted at the termination meeting that she had not actually told Burns or Wachter about her eyesight issues before the meeting.

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows

8

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2013). At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex*, 477 U.S. at 325). "When the moving party has carried this burden, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).) The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587). But "[t]he mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient," *Moldowan*, 578 F.3d at 374 (quoting *Anderson*, 477 U.S. at 252), and the non-movant's proof must be more than "merely colorable." *Anderson*, 477 U.S. at

9

249. An issue of fact is "genuine" only if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Matsushita*, 475 U.S. at 587).

## ANALYSIS

### I. Applicable Law

The ADA provides that a covered employer may not "discriminate against a qualified individual on the basis of disability" with respect to, *inter alia*, the discharge of employees, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112 (current 2013).[7] The ADA defines "discrimination" to include *"not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A)) (emphasis added).

A reasonable accommodation includes: "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring . . . *acquisition or modification of equipment or devices*, . . . and other similar accommodations for individuals with disabilities." *Kleiber*, 485 F.3d at 868 (quoting 42 U.S.C. § 12111(9)) (emphasis added). The ADA's implementing regulations provide that, "[t]o determine the appropriate reasonable accommodation, it may be necessary for [an employer] to initiate an informal, interactive process with the [employee]." *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R.

---

[7]The previous version of the ADA prohibited discrimination "because of" disability. In 2008 Congress amended the ADA to prohibit discrimination "on the basis of" disability, effective January 1, 2009. As discussed herein, the parties have not argued that the amended version of § 12112, which governs here, altered the applicable causation standard.

10

§ 1630.2(o)(3)) (brackets in original). The purpose of the interactive process "is to 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Id.* Accordingly, the interactive process requires communication and good-faith exploration of possible accommodations. *Id.* "Even though the interactive process is not described in the text of the ADA, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Id.* (emphasis added). "When a party obstructs the process or otherwise fails to participate in good faith, courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.* In unpublished cases, the Sixth Circuit has also indicated that an employer only violates the interactive process requirement if the employee can demonstrate that he or she could have been reasonably accommodated but for the employer's lack of good faith." *Denczak v. Ford Motor Co.*, 215 F. App'x 442, 445-46 (6th Cir. 2007) (citing *Breitfelder v. Leis*, 151 F. App'x 379, 386 (6th Cir. 2005)).

  Here, the parties appear to agree that the Trustee is pursuing two theories of liability: (1) a discriminatory discharge theory; and (2) a failure to accommodate theory. As some federal courts have acknowledged, these theories of liability are substantially related where, as here, the plaintiff contends that the employer's "failure to accommodate" itself precipitated the employee's termination. *See, e.g.*, *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139-40 (9th Cir. 2001) (observing that, "often the claims are, from a practical standpoint, the same," where "the consequence of the failure to accommodate is, as here, frequently an unlawful termination.") Indeed, the Sixth Circuit caselaw cited by the parties here appears to adopt multiple approaches to this issue that vary based on the theory or theories of ADA liability advanced in the particular case. *Compare Whitfield v. Tennessee*, 639 F.3d 253, 256 (6th Cir. 2011) (applying *McDonnell*

11

*Douglas* standard) *with Kleiber*, 485 F.3d at 868 (finding that direct evidence standard, not *McDonnell Douglas* standard, applies to failure to accommodate claims).[8] Although the court recognizes some tension in the caselaw concerning the appropriate summary judgment standard for these related theories of liability, the court is not inclined to further analyze the issue, because (a) the parties appear to agree, at least for purposes of summary judgment, that the *McDonnell Douglas* standard governs the discriminatory discharge theory and that a different standard governs the failure to accommodate theory, and (b) regardless of the specific standard applied, the Trustee has demonstrated that there are genuine disputes of material fact with respect to the core issues in this case.[9]

## II. Discriminatory Discharge

---

[8]In *Kleiber*, a discharged Honda employee argued that Honda failed to accommodate his disability by transferring him to another position at the company. The Sixth Circuit held that, because the ADA defines "discrimination" to include the failure to accommodate," claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination," requiring the court to "jettison" the *McDonnell Douglas* analysis. 485 F.3d at 868. The court also noted that "[t]his, of course, is not necessarily true of claims premised upon an adverse employment decision such as failure to hire, failure to promote, or discharge," *id.* at 869 n.2, a statement that this court finds confusing, given that the employee at issue in *Kleiber* had in fact been discharged. In *Whitfield*, the Sixth Circuit considered a case somewhat analogous to this one, in which a discharged employee argued that his employer's alleged failure to accommodate his disability precipitated his termination for performance deficiencies. *Id.* at 261-62. In contrast to *Kleiber*, the court applied the *McDonnell Douglas* burden-shifting framework to determine whether the employer would have fired the employee anyway. *Id.* It may be that *Kleiber* governs only situations in which there is no dispute about the counter-factual scenario (such as a denial of transfer case that turns on whether there was or was not another position available at a company), whereas the *McDonnell Douglas* approach applied in *Whitfield* governs situations in which the counter-factual scenario is, as is the case here, hypothetical and vigorously disputed.

[9]To the extent that the applicable legal standards could create confusion at trial and/or reflect multiple approaches to the same underlying disputed issues, the court anticipates that the parties will work cooperatively to fashion jury instructions that properly frame the relevant disputed issues for the jury.

12

To make out a *prima facie* case for employment discrimination under the ADA, a plaintiff must show that (1) she was disabled, (2) she was otherwise qualified for the position, (3) she suffered an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) she was replaced. *Id.* Once this burden is met, "the burden shifts to the [employer] to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Id.* at 259. The parties appear to agree that the Trustee must prove pretext under the "but for" causation standard. *See Lewis v. Humboldt Acquisition Corp, Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (*en banc*).[10]

Dollar General concedes, for purposes of summary judgment only, that the Trustee could establish genuine disputes of material fact with respect to the elements of his *prima facie* case, but it argues that the Trustee cannot show that Dollar General's stated reason for terminating Piper was a pretext for unlawful discrimination. Dollar General contends that (1) because Piper admits that she was terminated for performance deficiencies, the Trustee cannot prove pretext; or,

---

[10]In *Lewis*, the Sixth Circuit, in an opinion drawing several vigorous dissents, held that the "but for" causation standard governed ADA claims under the pre-2008 version of the statute, which prohibited discrimination "because of" an individual's disability. *Lewis* did not address the amended provision that now prohibits discrimination "on the basis of" an individual's disability. *See* 42 U.S.C. § 12112(a) (current 2013).

Here, the Trustee has not contested Dollar General's position that the "but for" causation standard articulated in *Lewis* continues to apply, notwithstanding the amended language. Because the issue is not in dispute, the court will assume that the "but for" standard applies here. However, the court expressly does not address whether there is any meaningful distinction between the pre- and post-amendment language. *Cf. Johnson v. Benton Cnty. Sch. Dist.*, — F. Supp. 2d — , 2013 WL 765614, at *5 (N.D. Miss. Feb. 25, 2013) (finding no meaningful distinction); *Fleischman v. Continental Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2013) (treating "because of" language in ADEA and "on the basis of" language in ADA "similarly"); *Palmquist v. Shinseki*, 689 F.3d 66, 74 (1st Cir. 2012) (same).

13

alternatively, (2) even if the court were to consider what would have happened if Piper had been granted an accommodation for her disability, the evidence shows that Dollar General would have terminated her anyway.

As an initial matter, the court disagrees with Dollar General's first argument as an inaccurate framing of the pretext inquiry. Because Piper argues that Dollar General's failure to accommodate her disability caused the performance deficiencies for which she was terminated, it is not enough for Dollar General simply to establish that it fired Piper for those performance deficiencies. Instead, under the approach the Sixth Circuit endorsed in *Whitfield* (and subject to the "but for" causation standard later set forth in *Lewis*), the relevant pretext inquiry is whether Dollar General's failure to accommodate Piper's disability was the "but for" cause of the performance deficiencies for which she was terminated. Stated another way, the question at this stage is whether the Trustee has produced evidence from which a rational trier of fact could conclude that, if Dollar General had granted Piper a reasonable accommodation, Piper would not have been fired for performance deficiencies.[11] This approach makes sense: it would frustrate the ADA's purposes if Dollar General could be insulated from liability for causing Piper to fail by refusing to accommodate her disability. Dollar General has offered no persuasive authority for this self-defeating application of the *McDonnell Douglas* burden-shifting framework here.

---

[11]Subject to the subsequent clarification in *Lewis* that the "but for" causation standard governs, the approach by the Sixth Circuit in *Whitfield* seems to be broadly consistent with the approach taken in at least one of the district court cases from outside the Sixth Circuit cited by the Trustee. *See Kravits v. Shinseki*, Civil Action No. 10-861, 2012 WL 604169, at *8-*9 (W.D. Pa. Feb. 24, 2012) (where employee alleged that employer failed to engage in interactive process and that lack of accommodation caused job errors for which he was terminated, pretext inquiry turned on whether an accommodation "could have obviated these mistakes and allowed Mr. Kravits to keep his job").

14

Applying the appropriate pretext analysis, the court finds that there is a genuine dispute of material fact as to whether Dollar General would have terminated Piper regardless of her requested accommodation. Construing the facts in the light most favorable to the Trustee, Piper repeatedly complained to her supervisors that her visual impairment was impacting her job performance, but Piper's supervisors rejected Piper's requests. Piper's supervisors mishandled Piper's requests in multiple respects by failing to report them up the supervisory chain and/or to Human Resources, by informing Piper that no accommodations would be granted under any circumstances or that accommodations would need to be within the existing budget, and by demeaning Piper for raising the possibility of an accommodation.

Drawing all reasonable inferences in the Trustee's favor, many if not all of Piper's performance deficiencies as a Garnishment Specialist were attributable to Dollar General's refusal to countenance her requests for a reasonable accommodation. Piper's bad eyesight negatively impacted her work as a Garnishment Specialist. Compared to the Payroll Specialist position, the Garnishment Specialist position was much more demanding, required multiple computer screens, and required more reading than the Payroll Specialist position. Thus, although Piper had been able to perform satisfactory work as a Payroll Specialist, the lack of accommodation caused her to fall behind and to struggle to meet the elevated efficiency requirements in her new role. She was forced to choose between (a) doing accurate work and falling behind or (b) working more quickly but making mistakes because of her vision. A jury reasonably could find that, if Dollar General instead had granted her an accommodation, Piper would have been able to perform efficient and accurate work to Dollar General's satisfaction.

Dollar General argues that at least some of Piper's performance deficiencies would have

15

occurred regardless of whether Piper received an accommodation for her eyesight and that it would have terminated Piper based on those issues alone. Dollar General's complete failure to engage in any type of interactive process with Piper, despite her (alleged) repeated requests, makes it difficult to assess this counter-factual scenario in the abstract. It may be that Piper's requests for a larger monitor and/or some type of tailored screen magnification would have resolved or prevented her performance deficiencies; moreover, even if those specific accommodations did not work, a jury could find that, through the interactive process, Dollar General and Piper would have identified some other type of reasonable accommodation that would have resolved the performance issues – and it does not take much imagination to think of potential accommodations for bad vision, which is a common condition. *See* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act at ¶ 32, 2002 WL 31994335, at *24 (Oct. 17, 2002) ("If a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not impose an undue hardship.")[12] On the other hand, Dollar General may be correct that Piper made serious mistakes that were not attributable to her eyesight, mistakes for which it would have terminated her regardless of any disability accommodation.

At any rate, because Piper's supervisors rebuffed Piper's requests for an accommodation and even demeaned her for asking for one, it is not obvious what actually would have happened

---

[12]As discussed in the next section, Miles (Dollar General's former Director of Human Resources) was aware of multiple forms of accommodations for employees with visual impairments. These accommodations included options of which Piper was not aware at the time.

16

if Dollar General had engaged in the requisite interactive process.  Indeed, Miles conceded that she had no way of knowing whether Piper would or would not have performed the essential functions of her job with an accommodation.  (*See* Docket No. 75, Ex. 4, Miles Dep. at 53:9-60:12.)  Ultimately, this is a fact question for the jury to decide.

Accordingly, the court finds that there are genuine disputes of material fact that preclude summary judgment on the Trustee's claim that Dollar General unlawfully terminated Piper in violation of the ADA.

### III.     Failure to Accommodate

To establish a failure to accommodate claim, the employee has the initial burden of persuasion to show that she requested an accommodation and that the requested accommodation was objectively reasonable.  *Brown v. Chase Brass & Copper Co., Inc.*, 14 F. App'x 482, 487 (6th Cir. 2001) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir.1996)); *Wardia v. Justice & Public Safety Cabinet Dep't of Juvenile Justice*, 509 F. App'x 527, 531 (6th Cir. Jan. 3, 2013).  The burden of persuasion then shifts to the employer to show that the proposed accommodation would impose an undue hardship.  *Brown*, 14 F. App'x at 487; *Wardia*, 509 F. App'x at 531.  Where an employee alleges a breakdown in the interactive process, the burden is on the employee to show that she could have been reasonably accommodated but for the employer's failure to engage in the interactive process.  *See Trout v. Aerospace Testing Alliance*, 303 F. App'x 272, 273 (6th Cir. 2008); *Denczak v. Ford Motor Co.*, 215 F. App'x 442, 446 (6th Cir. 2007).

Here, the Trustee argues that, (a) after Piper alerted her supervisors that her disability was impacting her work and that she required some type of reasonable accommodation, Dollar

17

General failed to engage in the requisite "interactive process", and (b) had Dollar General actually engaged in an interactive process, Piper and Dollar General would have identified a reasonable accommodation that would have enabled her to perform the essential functions of her job. For purposes of summary judgment, Dollar General does not dispute that it failed to engage in an interactive process after Piper requested an accommodation for her limited eyesight. However, for two reasons, Dollar General argues that the interactive process would have been futile.

First, Dollar General contends that Piper admitted at deposition that her requested accommodation would not have worked, because she tried using a larger monitor at home and it "didn't seem to help that much." Dollar General exaggerates the underlying cited testimony, which, in most relevant part, consisted of the following exchange:

> Q: Do you use a computer at home?
>
> A: Yes, I do at times.
>
> Q: And is that just a regular computer?
>
> A: Yes.
>
> Q: Does it have a bigger monitor on it?
>
> A: The one I have now does not. I had bought one with the bigger monitor, but didn't seem to help that much. With this one, I just zoom it to make it bigger, but I don't stay on it for long periods of time.

Piper was not questioned about any details concerning the references to a "bigger monitor," including what size it was. As Piper has now supplemented in her affidavit, the "bigger monitor" was actually a laptop with a 17-inch screen, which Piper at the time believed might help her more than the standard 15-inch laptop screen. After determining that it did not, she utilized a "regular"

18

computer at home, which, as of her deposition, "takes [her] longer than normal to get things done." Subsequent to her deposition, Piper purchased a 24-inch monitor with an automatic magnifier and a touch screen that aids her with magnifying images, which she claims makes "a world of a difference." (Piper Aff. ¶ 2.) Thus, whatever the ambiguous Piper deposition testimony cited by Dollar General proves, it is something less than an admission that *any* type of larger screen would not have assisted Piper.

Dollar General's position also assumes that Piper only requested a larger screen and that Piper is *per se* limited to the accommodations she requested. As an initial matter, testimony in the record indicates that Piper also requested a magnified viewscreen, not just a larger monitor. Piper also avers that technologies other than the ones she requested were available, even though she did not realize it at the time. Furthermore, Mills testified that, when she worked at AT&T before working at Dollar General, she had experience providing assistive technology to employees with visual impairments, including larger screens, magnified monitors, Braille keyboards for blind employees, and text to audio headsets that interpreted text on computer screens. (*See* Docket No. 57, Ex. 4, Miles Dep. at 37:10-40:19 and 46:17-48:9.) A jury rationally could infer that, if Dollar General had engaged Piper in the interactive process, as it should have, Piper and Dollar General might have identified appropriate assistive technologies, whether or not they were the ones that Piper originally requested. Of course, that is the nature and intent of the interactive process requirement, which, if the jury credits Piper's version of events, Dollar General ignored in bad faith. Thus, the court finds that there is at least a genuine dispute of material fact as to whether a reasonable accommodation was available and would have assisted Piper.

19

Second, Dollar General argues that, even with an accommodation, Piper would not have been able to perform certain essential functions of her job, and that, as a consequence, Dollar General would have terminated her anyway. For essentially the same reasons discussed in the previous section relating to the Trustee's discriminatory discharge theory, the court finds that there is a genuine dispute of fact on this point.

Accordingly, the court finds that there are genuine disputes of material fact that preclude summary judgment on the Trustee's failure to accommodate claim.

## CONCLUSION

For the reasons stated herein, Dollar General's Motion for Summary Judgment will be granted in part and denied in part. The Trustee's hostile work environment claim will be dismissed with prejudice. Summary judgment on the remaining claims will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge